

FILED _____ LODGED
_____ RECEIVED

OCT 1 5 2025

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                              DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| **CHISULA CHAMBERS,** | Case No.: 2:25-cv-01862-RAJ |
| Plaintiff, | |
| vs. | **FIRST AMENDED COMPLAINT** |
| **UNIVERSITY OF WASHINGTON; AMY HAVERLAND; MORIAH JANKE; AND MARLOWE RAMIREZ, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES,** | **JURY TRIAL DEMANDED** |
| Defendant | |

## TABLE OF CONTENTS

1. Introduction

2. Jurisdiction and Venue

3. Parties

4. Factual Background

5. Claims for Relief

    I. USERRA

    II. Title VII

    III. ADA

    IV. ADEA

    V. 42 U.S.C. § 1981

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 1

VI. 42 U.S.C. § 1983

    VII. Washington Law Against Discrimination

    VIII. Negligent Supervision

6.  Equitable Relief Requested

7.  Damages and Prayer for Relief

8.  Jury Demand

9.  Conclusion

10. Signature Block

## I. INTRODUCTION

**1.** Plaintiff Chisula Chambers ("Plaintiff") brings this First Amended Complaint against the University of Washington ("UW") and individual defendants for pervasive employment discrimination, unlawful retaliation, civil rights violations, and related state-law claims. Plaintiff is a Black woman, over the age of 40, a veteran, and a person with a qualifying disability including military service-connected PTSD, anxiety and depression. The conduct described below—spanning multiple years—reflects a pattern of discriminatory decision-making, deliberate indifference to violence and harassment, and retaliatory acts taken in response to Plaintiff's protected complaints. Plaintiff seeks declaratory, injunctive, compensatory, and punitive relief, and equitable remedies to prevent future harm to similarly situated employees.

## II. JURISDICTION AND VENUE

**2.** This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367. This action also arises under USERRA, 38 U.S.C. § 4311. Venue is proper in this District under 28 U.S.C. § 1391

because the events giving rise to the claims occurred at UW Medical Center in Seattle, Washington.

### III. PARTIES

**3.** Plaintiff Chisula Chambers is a resident of Tacoma, Washington. She served honorably in the U.S. Armed Forces, is a member of multiple protected classes, and is a qualified individual with a disability under the ADA.

**4.** Defendant University of Washington is a public university and employer headquartered in King County, Washington, and is subject to Title VII, ADA, ADEA, USERRA, and WLAD.

**5.** Defendant Amy Haverland was Nurse Manager at UW Medical Center and participated in supervisory decisions affecting Plaintiff.

**6.** Defendant Moriah Janke was Plaintiff's direct supervisor and participated in adverse employment actions against Plaintiff.

**7.** Defendant Marlowe Ramirez was Plaintiff's direct supervisor who engaged in threatening conduct which had been reported on multiple occasions to his direct supervisor, Amy Haverland, throughout 2022-2023 and reported to Julius Pascoe in HR on October 02, 2023.

**8.** The individual Defendants are sued in their individual and official capacities as an agent of the University of Washington. At all relevant times they acted under color of state law.

### IV. FACTUAL BACKGROUND

**9.** Student Years (2011 – 2015): While enrolled as a medical student at UW between 2011 and 2015, Plaintiff encountered bias and discriminatory actions and remarks from faculty and staff. She reported these incidents to the Ombudsman's Office and to the University's Complaint Investigation and Resolution Office (UCIRO). In January 2015 she filed a formal UCIRO complaint investigated by Kate Leonard; it was closed in August 2015 with a finding that the

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 3

University "could have done better" but no corrective action was taken. She then submitted a Public Records Act request for her records, which was delayed seven months and fulfilled only after she initiated legal action. The EEOC received her civil-rights complaint on August 4, 2015 (case no. 10152230) but never issued a right-to-sue letter or follow-up. These events instilled a well-founded belief that internal mechanisms at UW do not protect complainants. Throughout that period, she witnessed and reported racism and discriminatory treatment of students, patients and faculty of color.

Plaintiff began experiencing disparate treatment and exclusionary conduct at UW beginning in 2011, with documented incidents of racialized comments, denials of training opportunities, and interference with progressing past year two. Over time these individual instances accumulated into a pattern of differential treatment that became more acute following Plaintiff's disclosure of disability accommodations and reporting of discrimination. For instance,

**Example of Medical Racism and Dehumanization Through Forced Treatment:** The Plaintiff was a medical student at the **University of Washington School of Medicine (UWSOM)** who experienced profound personal tragedy with the deaths of both of her **grandparents**, who had been her primary support system. During this same period of immense grief, the Plaintiff was newly diagnosed with **Attention Deficit Hyperactivity Disorder (ADHD)** — a diagnosis that should have prompted understanding, accommodations, and supportive intervention from the university's administration. Instead, the Plaintiff's struggles were met with suspicion, judgment, and escalating institutional control.

Rather than receiving compassion, the Plaintiff was referred to the **Washington Physicians Health Program (WPHP)**, where she was placed under the supervision of **Jason Green**. What was framed as a wellness intervention became an ordeal of **forced medication,**

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 4

**surveillance, and coercive psychiatric control**. The Plaintiff was required to take medication against her will, submit to invasive monitoring, and comply with rigid behavioral expectations that ignored both her grief and her neurodivergence.

Throughout this process, the Plaintiff was not treated as a grieving or struggling human being but as a liability to be managed. Her pain was pathologized and her resistance to dehumanizing treatment was reframed as "noncompliance." Despite repeated outreach and documentation of her experiences, **Dean Anne Eacker, Dean David Acosta, Dean Erica Goldstein**, and Dr. **Francine Powel** all failed to intervene or provide meaningful support. Instead, they upheld and enforced the same punitive structures that perpetuated the Plaintiff's harm.

Over time, the Plaintiff's emotional and psychological resilience was systematically destroyed. She describes being "beat to a pulp" by the process—broken down until there was no motivation, no joy, and no will left to live, let alone to continue the demands of medical school. By the time she returned to her studies, the damage was irreparable: she was completely changed, dissociated, and unable to function. What was supposed to be a program of "healing" and "rehabilitation" left her unrecognizable to herself—disconnected from her former identity and purpose. The Plaintiff asserts that completing the WPHP program **caused irreversible harm**, both mentally and spiritually. The coercive, racially biased system of control masked as care stripped away her humanity and shattered her trust in the medical profession she had once aspired to serve.

According to Anne Eacker, to return to medical school, Plaintiff had to check every box and comply with all demands of the WPHP. To be clear, Plaintiff has no history of drug use, diversion, or alcohol abuse and there was no apparent justification for the referral to the WPHP program. Plaintiff was bombarded with weekly and bi-weekly appointments to WPHP-appointed

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 5

psychiatrists, phycologists, a learning specialist, and regular check-ins with WPHP including randomized urine drug tests. The appointed psychiatrists, Francine Powel, was the local top specialist in treating the combination of ADHD and PTSD. Under Dr. Powel's care, Plaintiff was placed on up to five (5) medications that has lasting and adverse effects on cognitive processing and memory to date. To further show that Plaintiff was not treated with the care she deserve, when Plaintiff reported to Dr. Powel that she was experiencing "skin crawling" as an adverse effect to one or the combination of medications she was mandated to take. Instead of taking her prescriptive responsibilities seriously and adjusting the medications, Dr. Francine Powel violated HIPAA and sent a message to both the WPHP and her Primary Care Doctor at the UW Student clinic and reported that Plaintiff had been abusing drugs. Not only did this subject the Plaintff to further scrutiny and bullying behavior from Jason Green, Plaintiff was forced to take a drug test, and that report is now forever in her medical records. Months later, when Plaintiff decided she needed to stop taking the medications, she reached out to Francine Powel who said she is no longer practicing and could not adjust the medications. Plaintiff was given the phone number of forwarding doctor who never answer the call or returned voicemail. With no other options, Plaintiff sought care from the VA to get off the medications forced upon her by WPHP. None of the doctors were comfortable stopping medications they did not prescribe. Plaintiff was forced to ween herself off 5 psychotropic medications alone with no medical oversight due to the actions of UW Medical school demanding engagement with WPHP. Plaintiff asserts that it was not common practice to force non-drug-abusing medical students into WPHP program or to force them to take medications that muted their behavior.

The Plaintiff's experience is part of a broader and well-documented historical pattern of racism and control in the field of medicine. For centuries, Black individuals have been subjected

to medical violence and coercion under the guise of treatment. The **non-consensual experiments of Dr. J. Marion Sims** on enslaved Black women, the **Tuskegee Syphilis Study**, and the **forced sterilizations** of Black women and girls in hospitals and state institutions are all part of a legacy in which medicine has been weaponized to dominate rather than heal.

In the psychiatric field, this same dynamic continues today. Black patients are more likely to be diagnosed with severe mental disorders, subjected to involuntary hospitalization, and forced to take psychotropic medications compared to their white counterparts. Expressions of grief, exhaustion, or justified resistance from Black individuals are too often misinterpreted as defiance, instability, or danger—labels that justify coercive intervention.

Within this framework, the actions of **Jason Green** and the **Washington Physicians Health Program**, reinforced by **the Deans of the Medical School and undergirded by a willing psychiatrist**, reflect systemic medical racism. Rather than seeing a grieving Black medical student in need of care and accommodation, they treated her as a problem to be controlled through forced medication and psychological subjugation.

This dehumanizing approach perpetuates the historical misuse of medicine as a tool of power rather than healing. It denies Black individuals the right to self-determination, pathologizes normal responses to trauma, and enforces compliance through fear. The Plaintiff's experience represents not an isolated incident but the continuation of a centuries-long pattern of racialized harm in the name of "healthcare.

Example 2: Discrimination in Disability Accommodation and Hostile Educational Environment: Upon returning from medical leave, the Plaintiff engaged with **Jon McGough**, who oversaw the implementation of **reasonable accommodations** for students in the **University of Washington School of Medicine (UWSOM)**. On the surface, Mr. McGough appeared to be fulfilling the school's legal obligations under the **Americans with Disabilities Act (ADA)** by coordinating the Plaintiff's accommodations. However, in practice, the process became a relentless and demoralizing ordeal marked by excessive scrutiny, doubt, and repeated demands for justification.

Rather than following the recommendations of the licensed **ADHD specialist**, who had provided a clear and detailed outline of the Plaintiff's required academic accommodations, Mr. McGough and other administrators **continuously required the Plaintiff to "prove" her disability**. She was repeatedly asked to **write multiple explanations**, attend additional meetings, and spend valuable study time defending the legitimacy of her diagnosis and her right to basic academic support.

Instead of streamlining the process to support her success, the university erected barriers that consumed her emotional and cognitive energy—time that should have been dedicated to learning. The Plaintiff was forced to meet with **multiple individuals both inside and outside the School of Medicine**, each requiring her to relive, explain, and justify her condition. These constant interrogations created a hostile and exhausting environment.

At one point, a **dean** insensitively asked the Plaintiff, *"How did you even graduate from high school, let alone college, if you have this level of disability?"* — a statement that was both **humiliating and discriminatory**, reflecting a fundamental misunderstanding of neurodivergence

and the many ways in which capable students with ADHD learn to succeed through adaptive strategies.

The most demeaning incident occurred when a staff assistant mocked the Plaintiff's persistence in requesting her legally entitled supports. With a sarcastic tone, the assistant sneered, *"Would you like some cheese with those crackers?"*—implying that the Plaintiff's advocacy for fair treatment was nothing more than whining or self-indulgence, like asking to be served **wine and charcuterie**. This statement trivialized the Plaintiff's struggle and reinforced a culture of disrespect toward students with disabilities.

This pattern of behavior was **not supportive, trauma-informed, or legally compliant**. By demanding constant explanations, ignoring specialist recommendations, and mocking Plaintiff's disability, the **University of Washington School of Medicine** engaged in conduct that undermined the very intent of disability law—to ensure equal access, dignity, and opportunity for all students.

Under the **Americans with Disabilities Act (ADA)** and **Section 504 of the Rehabilitation Act**, institutions are required to provide reasonable accommodations **without placing undue burden on the person with the disability**. Forcing a student to repeatedly justify their condition or attend redundant meetings constitutes a **failure to accommodate** and creates a **hostile educational environment**.

Moreover, the ridicule and belittling comments—such as comparing the Plaintiff's requests for academic fairness to "asking for cheese with crackers"—reflect a pattern of **ableism and discriminatory bias** that invalidates disability as a legitimate lived experience. This kind of mockery reinforces shame and stigma, deterring other students from seeking help and perpetuating institutional exclusion.

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 9

When viewed alongside the Plaintiff's prior experiences of racialized dehumanization and forced medical control, this continued pattern of disbelief, ridicule, and bureaucratic obstruction forms a clear **continuum of systemic discrimination**—one that targets both her identity as a **Black woman** and as a **person with a recognized disability**.

**2011-2015:** Several occurrences such as the previous two examples were reported to find supports while attempting to be successful in a hostile learning environment. Earlier student-era complaints (UCIRO, Ombudsman, EEOC) were ignored. UW's silence and obstruction deprived Plaintiff of available remedies and constitute a pattern of institutional indifference. EXHIBIT. Therefore, when the Plaintiff returned to the UW in 2021 hoping the environment would be more progressive in the era of anti-racism and DEI, when emails, reports, and activism went unheard or unacted upon, there was no trust in internal systems to support her success.

**Employment and Veteran Status (2021 – 2023):** After completing her education, Plaintiff accepted employment with UW Medical Center (UWMC) and she became a member of the DEI committee and trained as a Peer Supporter. She entered with a record of exemplary service and brought the discipline and professionalism of her military background. Her colleagues and supervisors were aware of her veteran status. Over time she observed racial disparities in patient treatment, management and voiced concerns individually, during staff meetings and DEI committees.

Example 1: Racial Discrimination and Targeted Restriction of Peer Support Activities: As a **Peer Supporter**, the Plaintiff was regularly approached by other **Black employees** who sought a safe and understanding space to discuss their work-related concerns. These conversations often centered around navigating racialized experiences and systemic barriers within the healthcare environment.

When the Plaintiff documented these Peer Support hours as required by program policy, **Marie Cockerham**, Director of Healthcare Worker Wellbeing and manager of the Peer Support Program, **reprimanded** the Plaintiff for spending "too much time" supporting one particular Black nurse. Ms. Cockerham then issued **explicit instructions** limiting how the Plaintiff could provide support, stating that she was to **"listen only"** and was prohibited from offering advice, serving as a sounding board for ideas, or engaging in any relationship that could be construed as **mentorship.**

These restrictions were **not imposed on non-Black Peer Supporters** nor on interactions involving non-Black employees. At minimum, such directives disproportionately targeted and **policed how Black employees could connect and support one another,** especially in an institution already marked by patterns of systemic exclusion and racial inequity.

This conduct was **racist and discriminatory** because it undermined culturally grounded support between Black colleagues and denied them access to the same emotional and professional solidarity afforded to others. By restricting meaningful peer engagement only when it involved Black employees, leadership **reinforced isolation, mistrust, and unequal treatment,** perpetuating the very harm the Peer Support Program was intended to alleviate.

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 11

Example 2: Retaliation, Lack of Whistleblower Protection, and Burden-Shifting: After repeated experiences of discrimination and retaliation within the **University of Washington School of Medicine (UWSOM)**, the Plaintiff requested to take an **administrative leave** so that **Human Resources** could conduct a thorough investigation into the hostile, discriminatory, and retaliatory behaviors pervasive in her environment.

Instead of providing an option that would protect her employment status and ensure a fair, trauma-informed process, the Plaintiff was told by HR and leadership that **"there is no administrative leave available to support whistleblowing."** She was presented with only two options: **resign quietly** or **take another medical leave**.

The Plaintiff viewed this as deeply unfair. The **"choice"** forced her to shoulder the personal and financial consequences of systemic institutional failure. Once again, she was compelled to take **medical leave**—not because of a new or unrelated illness, but because the **PTSD exacerbation, panic attacks, and psychological distress** she experienced were directly tied to the ongoing **hostile work environment** and **institutional retaliation**.

This practice effectively punished her for speaking out. Rather than protecting her as a whistleblower or addressing the systemic harm, the institution labeled her distress as a personal medical issue, thereby **shifting responsibility away from the university** and onto the Plaintiff herself. **Why This Conduct Was Discriminatory and Retaliatory.** This response was neither supportive nor compliant with basic principles of equity, trauma-informed practice, or anti-retaliation law. Under **Title VII of the Civil Rights Act, Title IX,** and **state whistleblower protection laws**, an employee or student who reports discrimination is entitled to protection from retaliation and should not be forced to take medical leave to shield herself from harm.

By refusing to provide administrative leave during the investigation and instead coercing the Plaintiff into medical leave, the institution:

- **Invalidated her report** of discrimination and retaliation.

- **Misclassified a systemic workplace problem** as an individual medical issue.

- **Created a chilling effect**, discouraging future whistleblowing by making self-protection costly and stigmatizing.

- **Imposed emotional and financial burden** on the Plaintiff, effectively punishing her for seeking justice.

This conduct reveals a **pattern of institutional avoidance and retaliation**: rather than addressing structural racism, harassment, and ableism, the University repeatedly displaced responsibility onto the Plaintiff. The message was clear protecting **the system mattered more than protecting the person harmed by it**.

Example 3: Racialized Hostility, White Fragility, and Retaliation in the Workplace: The Plaintiff observed ongoing racialized dynamics within her unit at **UWMC**, where a particular white nurse regularly exhibited behaviors consistent with **white female fragility** and **white supremacy culture**—such as condescension, unnecessary correction, and intruding in areas outside her authority. These patterns had already driven one employee to transfer to another unit, and a pharmacy technician privately confided in the Plaintiff about similar distress caused by this nurse's behavior.

After several months of intentionally avoiding confrontation, the white nurse approached the Plaintiff directly, stating that she "felt there was a problem" between them and that she wanted to "engage freely." The Plaintiff calmly and professionally responded that she **would only be**

**willing to engage in a discussion if it was moderated by management,** given the previous incidents and her discomfort with the nurse's behavior.

Shortly afterward, and **without any reports of negligence or professional concern** about the Plaintiff's work, she was summoned to a meeting with **Department Manager Amy Haverland** and **Assistant Nurse Manager Moriah Janke**. The purpose of the meeting was to discuss the "interpersonal issue" raised by the white nurse—a **non-critical matter** based solely on the nurse's personal feelings.

In the meeting, the Plaintiff found herself seated alone in a small room **facing three white women,** expected to explain why she "felt unsafe" around one of them. Despite the emotional weight of the situation, the Plaintiff spoke truthfully and bravely, explaining that the nurse demonstrated a **pattern of behavior that made Black employees feel unsafe,** citing her history of prying, correcting, and inserting herself into others' work without authority—behavior colloquially described today as that of a **"Karen."**

The nurse became tearful and claimed she had not realized her actions were harmful. The Plaintiff offered historical and social context to help her understand how these behaviors stem from internalized bias and systems of racial dominance. Rather than addressing the issue of **racialized harm, Manager Amy Haverland** redirected the conversation to normalize the nurse's reaction, describing her tears and discomfort as "an understandable example of white fragility" and suggesting that "it's valuable for others to learn from this."

Haverland then **asked the Plaintiff to lead a department-wide discussion on implicit bias and racism in nursing,** positioning her—rather than the institution—as the one responsible for educating her colleagues. Although the Plaintiff accepted, seeing an opportunity to create a

more inclusive environment, this moment marked the **beginning of escalating hostility** toward her in the ICU.

While some coworkers were genuinely open to reflection and learning, others responded with resentment. **Assistant Nurse Manager Marlowe Ramirez**, in particular, began to **antagonize the Plaintiff daily,** asking provocative or overly "intellectual" questions that carried undertones of challenge or disbelief. Over time, Ramirez's conduct became openly **hostile and exclusionary**, using sarcasm, public second-guessing, and social isolation as tools of intimidation. The environment grew increasingly unsafe, and the Plaintiff's attempts to engage in constructive dialogue were met with defensiveness and punishment.

When the Plaintiff reported critical issues such as racism, discrimination, and workplace bullying, **no meetings were convened with co-workers or management to address or resolve the concerns,** demonstrating a clear disparity in how complaints were handled compared to non-racial or less serious interpersonal matters. Plaintiff's advocacy led to scrutiny, isolation, and retaliation by supervisors including Haverland, Janke, and Ramirez. For example, Plaintiff received reprimand when addressing clear racial disparities in patient care. A Black woman undergoing total removal of her reproductive system was given only Ibuprofen or Tylenol for pain relief. In contrast, a White male with a less invasive procedure and a known history of substance abuse was prescribed four narcotics, leaving him visibly intoxicated. When Plaintiff reported these disparities to Nurse Manager Amy Haverland, she became angry and questioned Plaintiff's professional judgment, despite Plaintiff's 15+ years of nursing experience.

Why This Conduct Was Discriminatory and Retaliatory. This series of events demonstrates how **white fragility and institutional complicity** can convert a legitimate

complaint of racialized harm into further trauma for the person harmed. The Plaintiff's valid boundaries were pathologized as interpersonal tension rather than recognized as self-protection in a racially hostile environment. By centering the white nurse's emotional discomfort and requiring the Plaintiff to justify her sense of safety, management reinforced a **racial power imbalance**—where the feelings of white staff were prioritized over the psychological safety of a Black employee. This pattern is a well-documented feature of **workplace racial gaslighting** and **retaliatory hostility**, often seen when Black professionals identify inequities in predominantly white institutions.

Furthermore, by assigning the Plaintiff the burden of leading anti-racism education—rather than providing systemic training or accountability measures—leadership effectively **shifted responsibility** for institutional change onto the person experiencing discrimination. The subsequent hostility from staff, including **Marlowe Ramirez**, reflects retaliation and social punishment for speaking out about racism, both of which are prohibited under **Title VII of the Civil Rights Act** and **EEOC anti-retaliation standards**.

In sum, what began as the Plaintiff's brave effort to address a racially unsafe environment resulted in **institutional betrayal, retaliation, and further psychological harm**, deepening the pattern of discrimination and isolation already evident in prior incidents.

Her efforts to educate coworkers about equity were met with hostility and mockery rather than support. When she requested that management intervene to address racist comments and unequal workloads, Defendants began to scrutinize her performance and exclude her from team activities. For example, Assistant Nurse Manager Marlowe Ramirez admitted during a DEI session led by the

Plaintiff that in his nursing education in the Philippines, he was taught that "Black patients have a higher pain tolerance," perpetuating racist medical myths that harm patients of color. As a leader responsible for training and orienting new ICU nurses, his perpetuation of such ideas embedded racial bias into clinical practice. Mr. Ramirez was also a primary source of bullying and retaliation experienced by Plaintiff on the 5E Surgical ICU.

**June 18, 2023:** Following an earlier complaint, Alyssa X (OR Nurse) while on duty at UW Medical Center, deliberately shoulder-checked her while passing, causing immediate physical and emotional distress. The contact was unprovoked and occurred shortly after Plaintiff had reported discriminatory conduct by staff. Plaintiff immediately reported the incident to her supervisor Amy Haverland, but no investigation or protective action followed. Instead, colleagues were encouraged to avoid her and to treat her as a troublemaker. The assault was reported via text to Nurse Manager Amy Haverland the same day.

When Plaintiff was later asked to return to work, the investigation had not been completed, nor had any of her concerns been addressed. Because Plaintiff could not continue to submit medical documentation for a leave that was in fact necessitated by harassment and retaliation—not medical illness (although service-connected PTSD was indeed exacerbated)—UW terminated her employment for failure to return from medical leave or submit additional forms to extend the leave. This outcome underscores the systemic gap: there is no system in place in the entire State of Washington to support a whistleblower reporting systemic racism and retaliation within healthcare institutions, leaving Plaintiff without protection despite her documented complaints.

EXHIBIT

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 17

**June 18, 2023:** Plaintiff reported harassment via text message to Haverland and the DEI Director; no protection was provided. EXHIBIT

**June–August 2022:** Plaintiff submitted written complaints to UW Human Resources and the DEI office detailing the assault, hostile work environment, and request for safety measures. HR provided no meaningful protective measures and failed to investigate promptly. EXHIBIT

**October 22, 2023:** Plaintiff escalated the matter to HR. After alleged internal investigation -- HR representative Julius Pasco closed Plaintiff's internal complaint without substantiation on or about February 10, 2024, blaming Plaintiff for 'creating discomfort' and failing to address Ramirez's conduct. Plaintiff reported to Human Resources, racism, retaliation, and failure to accommodate her stress-related health conditions. She was forced to request medical leave to preserve her employment and pension. When questioned about Assistant Nurse Manager, Marlowe Ramirez, Pasco replied, "Who?" He wrote down Ramirez's name and speculated that this portion of the investigation was being handled "internally" by Unit Manager Amy Haverland — the very individual accused in Plaintiff's reports. Pasco promised follow-up but has never contacted Plaintiff again. EXHIBIT

**December 11, 2023:** "Restorative justice" Zoom session with Paula Houston,, Elaine Acacio, and Julia Ismeal. Rather than a healing process, the meeting required her to recount trauma in front of administrators who refused to acknowledge responsibility. Julia Ismael, present as a community support person, objected that the process was not restorative and was inflicting further harm. Plaintiff left the meeting re-traumatized and without remedy. EXHIBIT

**February 26, 2025:** Plaintiff served a demand letter detailing injuries and requesting remediation; UW did not provide a substantive response within a reasonable time. EXHIBIT

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 18

**May 12, 2025:** Plaintiff served a second demand letter. UW did not provide a substantive response in a reasonable time. EXHIBIT

**September 29–30, 2025:** Plaintiff filed a tort claim with the University's Office of Risk Management (Claim No. 3601023727). Summit Law Group (counsel for UW) later responded with a demand to dismiss rather than to investigate or resolve the allegations.

10. Throughout these years, Plaintiff was excluded from key meetings, denied professional development, and was subject to differential timekeeping and performance reviews. The adverse employment decisions intensified after Plaintiff engaged in protected activity—reporting harassment, requesting accommodation, and asserting veteran status protections.

**Renewed Demands and Tort Claim (2025):** On February 26, 2025, Plaintiff sent a formal legal demand letter to the University documenting discrimination and retaliation. No response was received. On September 12, 2025, she sent a second demand letter. The University remained silent until September 26, 2025, when counsel from Summit Law Group responded only to insist on filing a tort claim with the Office of Risk Management (ORM). Plaintiff immediately complied, faxing her claim on September 29, 2025, which was logged September 30 under Claim No. 3601023727. ***The University's seven-month silence had caused the delay that Defendants now seek to use against her.***

Plaintiff reserves their right to address additional claims through discovery.

### Protected Activity and Retaliation

11. Plaintiff repeatedly engaged in protected conduct by reporting discrimination to management, requesting reasonable workplace accommodations related to her disability, and asserting her veteran status under USERRA. Following these protected reports, Plaintiff experienced materially adverse actions including reduction in duties, reassignment of

responsibilities to less favorable positions, exclusion from supervisory meetings, negative performance entries, and ultimately constructive discharge conditions. These adverse actions were causally connected to Plaintiff's protected conduct. For instance,

EXAMPLE 1: Violation of USERRA and Discriminatory Treatment Based on Veteran Status: During her time as a medical student at the University of Washington School of Medicine (UWSOM), the Plaintiff was summoned to a meeting with Dean Anne Eacker. At the scheduled time, Dean Eacker greeted the Plaintiff in the lobby and escorted her back toward her office. As they passed another student sitting nearby, Dean Eacker remarked, "I'm taking out the trash," and shared a smile with the student before continuing to walk with the Plaintiff.

Once inside her office, Dean Eacker abruptly slapped the Plaintiff's student file onto the table and began questioning her about her military background, asking, "Did you serve the country honorably?" She went on to say that she had seen in the Plaintiff's record that her discharge status was listed as "other than honorable (OTH)."

The Plaintiff was taken aback by this line of questioning, as the meeting had been scheduled to discuss her return to medical school following a stressful medical leave, not her military service. The Plaintiff felt cornered and compelled to explain and justify her discharge, which was related to her reporting of Military Sexual Trauma (MST) during her deployment to Vicenza, Italy. The Plaintiff clarified that the OTH discharge had been part of the military's retaliatory actions for her MST report, and that she was actively challenging it.

Since that time, the Department of Veterans Affairs has corrected her record, and the Plaintiff is now formally recognized as an honorably discharged, service-connected veteran.

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 20

The Plaintiff asserts that her military history and temporary discharge status were improperly used to discredit, stigmatize, and marginalize her—both during this meeting and throughout her academic experience between 2012 and 2014.

Why This Conduct Violates USERRA and Constitutes Discrimination. Under the Uniformed Services Employment and Reemployment Rights Act (USERRA), institutions are prohibited from discriminating against individuals based on their past, present, or future military service. This includes negative treatment, harassment, or career disadvantage arising from military status, discharge characterization, or conditions related to service, such as MST-related trauma.

Dean Eacker's comment, "taking out the trash," followed by aggressive questioning about the Plaintiff's discharge status, demonstrated hostility and bias toward the Plaintiff's military service. This conduct not only humiliated the Plaintiff in front of peers but also implied moral deficiency based on an administrative discharge that was later proven unjust.

Such treatment created a chilling effect, discouraging the Plaintiff from asserting her rights as a veteran and compounding the trauma already endured from her MST experience. It also contributed to a pattern of systemic mistreatment, where the Plaintiff's identity—as a Black woman veteran, MST survivor, and student with a disability—was repeatedly used to justify unequal treatment and institutional neglect.

EXAMPLE 2: Failure to Provide Reasonable Scheduling Accommodations and Bias Against Veteran-Associated PTSD: When the Plaintiff, a veteran and registered nurse, requested reasonable accommodations from Assistant Nurse Manager Moriah Janke on the 5E Surgical Intensive Care Unit (SICU) at UWMC, the request centered around the need for structured and

consistent scheduling to manage the combined challenges of Post-Traumatic Stress Disorder (PTSD) and Attention Deficit Hyperactivity Disorder (ADHD).

The Plaintiff explained that the random, sporadic scheduling of the 5E SICU — which varied week to week depending on unit needs — made it increasingly difficult to maintain focus, rest patterns, and emotional regulation. One week, the Plaintiff might be scheduled Tuesday through Thursday, and the next, Friday through Sunday, creating constant disruption and instability. To better manage her conditions and perform optimally, the Plaintiff requested that structure be imposed onto her schedule as part of her reasonable accommodation(s).

During these discussions, Moriah Janke responded dismissively, stating that the Plaintiff was "just too hypervigilant" and that "if she could manage that, things might be better." The term *hypervigilant* is frequently and inaccurately used to stereotype veterans with PTSD as overly reactive or difficult, reflecting a bias rooted in misunderstanding trauma-related conditions rather than addressing legitimate medical needs.

As a supposed accommodation, Janke offered a temporary schedule adjustment, allowing the Plaintiff to work a Flex Nurse schedule from 11:00 a.m. to 11:30 p.m. instead of the standard 7:00 a.m. to 7:30 p.m. shifts. This change initially provided the structure and stability needed for the Plaintiff to function effectively. However, after only a few weeks, Janke rescinded this accommodation when scheduling responsibilities were given to Julie, claiming that other nurses were requesting the same shift.

The scheduling responsibility was then transferred to an admin staff, Julie, who informed the Plaintiff that she was no longer entitled to the Flex schedule that had previously been approved. Julie stated that the Plaintiff would now have to "request" the schedule change alongside ten other nurses seeking similar hours, effectively eliminating the accommodation altogether.

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 22

As a result, the Plaintiff was returned to the same unstructured, erratic schedule that had triggered her PTSD symptoms and interfered with her ability to perform her job safely. This denial of accommodation not only ignored the Plaintiff's documented medical needs but also re-exposed her to the full intensity of the hostile work environment, where she had already endured assignment hazing, racial bias, and psychological distress.

Why This Conduct Violated USERRA and Disability Law: Under the Uniformed Services Employment and Reemployment Rights Act (USERRA), veterans are protected from discrimination in employment based on their military service or any condition resulting from that service, including PTSD. Similarly, the Americans with Disabilities Act (ADA) requires employers to provide reasonable accommodations to employees whose disabilities substantially limit major life activities—such as maintaining concentration, sleep patterns, or stress regulation.

By dismissing the Plaintiff's request as "hypervigilance," Assistant Nurse Manager Moriah Janke invoked a stereotype commonly associated with veterans and trauma survivors, trivializing her legitimate need for structure and stability. The subsequent rescission of the agreed-upon Flex schedule—especially after the Plaintiff had begun to experience its benefits—constitutes a failure to engage in an interactive process and a denial of reasonable accommodation.

Moreover, the use of derogatory psychological labels tied to veteran status, combined with the arbitrary revocation of an implemented accommodation, reflects discriminatory bias against veterans with PTSD, which is explicitly prohibited under USERRA §4311.

The Plaintiff asserts that this pattern of disregard and bias was rooted in institutional prejudice toward veterans and people of color—particularly the stereotype of the "hypervigilant" or "unstable" Black veteran—and that her requests for support were dismissed and withdrawn on the basis of those discriminatory assumptions rather than on operational necessity.

**Pattern and Practice:** Plaintiff observed that Black employees within the DEI Committee were routinely mishandled by supervisors and HR, pressured to resign, and denied due process. Her own case mirrors that pattern and demonstrates an institutional failure to protect employees who oppose racism or speak out on behalf of equity. Plaintiff's case parallels that of **Dr. Benjamin Danielson v. Seattle Children's Hospital (23-2-19905-7, King County Superior Court).** Plaintiff sought mentorship from Dr. Danielson, a praised community leader, during her retaliation and discrimination. Yet Dr. Danielson was himself enduring retaliation and discrimination as faculty and staff and was unable to provide the protection or intervention Plaintiff needed. This shows how deeply systemic retaliation and discrimination are within UW and its affiliates See *CASE #: 23-2-19905-7 SEA*. EXHIBIT

## V. CLAIMS FOR RELIEF

### Count I – USERRA (38 U.S.C. § 4311)

**USERRA** prohibits employment discrimination and retaliation based on military service.

**Elements: Protected Status**

The Plaintiff is a **United States veteran**, a status protected under the **Uniformed Services Employment and Reemployment Rights Act (USERRA).** Her service included deployments that resulted in lasting effects from **military trauma** and a continued commitment to serve in healthcare.

**Adverse Action**

While employed with **Overlake Hospital**, the **Director of Nursing for the Emergency Department** made several discriminatory remarks regarding the Plaintiff's physical presence and demeanor, stating that her **"posture and demeanor were militant"** and that coworkers and

patients might be **"intimidated by her stance."** These comments invoked harmful and racially charged stereotypes often used to characterize **Black veterans**, conflating confidence and professionalism with aggression or hostility. Such language created a **hostile work environment** and directly impacted the Plaintiff's ability to be perceived and treated fairly as both a nurse and a veteran.

**Causal Connection**

The Plaintiff asserts that these biased perceptions of her as "militant" and "intimidating" were **rooted in stereotypes about veterans**—particularly **Black women veterans**—as being overly assertive, rigid, or combative due to military training. This perception followed her into subsequent employment.

When the Plaintiff later began working at the **University of Washington Medical Center (UWMC) 5E Surgical Intensive Care Unit (SICU)** in the fall of 2020 as a **senior nursing student**, she encountered **Nurse Practitioner Gayle Roberson Wiley,** who had previously worked at **Overlake Hospital** during the same period. The Plaintiff believes that Nurse Practitioner Wiley, now part of the leadership team at UWMC 5E SICU, **carried forward her preconceived, biased opinions** of the Plaintiff from her time at Overlake.

As a result, the Plaintiff was denied a fair opportunity for a **fresh, unbiased professional start** at UWMC. Her past reputation—tainted by discriminatory assumptions made in a prior workplace—was **imported into the new environment**, perpetuating a cycle of bias and exclusion based on her **veteran status and identity as a Black woman**.

**Damages**

The cumulative effect of these actions caused **significant professional and emotional harm**. The Plaintiff's credibility and confidence were undermined by repeated mischaracterizations

rooted in racialized and veteran-based stereotypes. The continuation of these biases across workplaces limited her ability to establish professional trust, disrupted her employment trajectory, and contributed to **ongoing emotional distress** linked to workplace trauma and systemic discrimination.

The Plaintiff asserts that the **causal connection** between her **protected veteran status** and the **adverse employment actions** is evident in the consistent invocation of "militant" or "intimidating" descriptors—terms historically used to demean veterans, particularly women of color who exhibit leadership and confidence. These actions violated her rights under **USERRA,** which prohibits discrimination and retaliation against employees based on military service or conditions arising from that service.

**Facts Supporting Claim:** Plaintiff served in the U.S. military. After invoking protections and requesting related accommodations, she faced demotions, denial of reassignment opportunities, and retaliatory performance reviews. The pattern of adverse actions began after Plaintiff's disclosures and persisted despite notice to HR. Her military background is known within her department and has shaped both her discipline and her approach to patient care. Defendants unlawfully discriminated against her on the basis of this status and retaliated when she sought the protections guaranteed under 38 U.S.C. § 4311. Supervisors and coworkers referred to her service in dismissive or mocking terms, implying that her "military tone" was incompatible with the department's culture. When she invoked her rights as a veteran to request equal consideration in scheduling and leave, management became increasingly hostile. UW's subsequent indifference to her complaints and its refusal to address retaliation constitute a violation of the Act. See Leisek v. Brightwood Corp., 278 F.3d 895 (9th Cir. 2002).[1]

### Count II – Title VII (42 U.S.C. § 2000e–2)

Title VII prohibits employment discrimination and retaliation on the basis of race and sex.

**Elements:** Protected class membership; adverse employment action; nexus to protected status; employer liability.

**Facts Supporting Claim:** Plaintiff, as a Black woman, was subjected to race- and sex-based differential treatment including derogatory comments, exclusion from assignments, and materially adverse decisions following complaints. The hostile work environment culminated in physical assault and the University's failure to remediate. Defendants created and perpetuated a racially and sexually hostile work environment. Plaintiff regularly witnessed bias in the treatment of patients and staff of color, and when she objected, she was targeted as disruptive. The "restorative justice" meeting in December 2023 epitomized the retaliatory culture: rather than resolving discrimination, administrators forced her to relive trauma while denying accountability. Such conduct constitutes discrimination and retaliation under 42 U.S.C. § 2000e-2(a). UW's managers ignored her complaints, failed to prevent harassment, and allowed retaliatory acts to continue until she was effectively pushed from her position.

### Count III – ADA (42 U.S.C. § 12112)

**ADA** prohibits discrimination and requires reasonable accommodation for qualified individuals with disabilities.

**Elements:** Qualifying disability; notice to employer; failure to provide reasonable accommodation; adverse action.

**Facts Supporting Claim:** Plaintiff disclosed service-connected disabilities and requested reasonable workplace accommodations. The employer failed to engage in the interactive process, denied accommodation, coerced plaintiff not to fie for accommodation stating that it would

limited her advancement opportunities. Instead Supervisor [insert name] offered a change in schedule so that plaintiff could have a more structured work schedule. Plaintiff believed this accommodation was just for her but later lost the accommodation due to others being offered the same.

### Count IV – ADEA (29 U.S.C. § 623)

**ADEA** prohibits age discrimination against employees over 40.

**Elements:** Plaintiff's age (>40); adverse treatment; causal connection; damages.

**Facts Supporting Claim:** Plaintiff experienced age-based exclusion from advancement and participation in training opportunities, contrasted with preferential treatment given to substantially younger employees. During her tenure, younger nurses and students were favored for opportunities, scheduling, and advancement. Comments by supervisors suggested that Plaintiff's age and "old-school" military approach were liabilities. Defendants discriminated against her because of age and veteran status, contravening 29 U.S.C. § 623(a)(1) and (d).

### Count V – 42 U.S.C. § 1981

**Section 1981** prohibits racial discrimination in the making and enforcement of contracts.

**Elements:** Race-based denial of employment benefits, promotions, or contract rights.

**Facts Supporting Claim:** Defendants denied Plaintiff fair access to promotions, training, and contractual opportunities on the basis of race, affecting her economic prospects and opportunities for advancement. Section 1981 guarantees all persons the same right to make and enforce contracts as white citizens. Plaintiff's employment relationship and her access to training and assignments were impaired on the basis of race. She was subjected to disparate discipline and denied the same resources and mentorship routinely provided to white employees. These actions

interfered with her contractual employment rights and constitute racial discrimination under federal law.

### Count VI – 42 U.S.C. § 1983

**Section 1983** provides a civil remedy for deprivation of federal rights under color of state law.

**Elements:** State actor conduct; deprivation of constitutional rights (Equal Protection/Due Process); causation.

**Facts Supporting Claim:** Individual Defendants, acting under color of state law, engaged in deliberate indifference to Plaintiff's safety and complaints, and thus violated her constitutional rights to equal protection and due process. The individual defendants, acting under color of state law, deprived Plaintiff of constitutional rights to Equal Protection and Due Process. They punished her for speech on matters of public concern—systemic racism and patient equity—thereby violating the First and Fourteenth Amendments. Their conduct was intentional, malicious, and carried out with reckless disregard for her federally protected rights.

### Count VII – WLAD (RCW 49.60.180)

Washington Law Against Discrimination provides state-law protection(s) against discrimination and retaliation.

**Elements:** Protected class; adverse action; causation; damages.

**Facts Supporting Claim:** Plaintiff's state-law claims mirror the federal allegations, with additional relief available under RCW 49.60. Under RCW 49.60.180, it is an unfair practice for an employer to discriminate or retaliate on the basis of race, sex, disability, age, or military status. Defendants engaged in each of these prohibited forms of conduct. The University's HR and DEI offices failed to take corrective measures despite actual notice. This negligence, compounded over years, reflects institutional bias contrary to state law and public policy.

Plaintiff also witnessed employees of color experiencing targeted bullying by a white nurse. One employee, a patient care technician, left the unit in fear for his job; another, a pharmacy technician of color, confided in Plaintiff about being cornered by the same nurse. When Plaintiff reported her concerns, UW held a meeting with Plaintiff, the nurse, and two managers. The nurse cried, claimed ignorance, and management asked Plaintiff to use her DEI knowledge to educate ICU staff. Plaintiff's clinical hours were reduced by 12, and she was reassigned to create DEI lectures — uncompensated duties that further isolated her.

### Count VIII – Negligent Supervision

Common law negligence by employer for failure to supervise and prevent foreseeable harm.

**Elements:** Employer owed duty; breach; causation; damages.

**Facts Supporting Claim:** UW breached its duty by failing to supervise and remediate known abusive conduct, including physical assault by Defendant Ramirez, foreseeably causing Plaintiff's injuries. UW owed Plaintiff a duty to supervise and discipline its managerial staff to prevent foreseeable harassment. By retaining Ramirez, Haverland, and Janke after repeated complaints, the University breached that duty. Its inaction directly caused Plaintiff's emotional distress, health deterioration, and constructive separation from employment.

**Key Case Law & Legal Doctrine**

**Ross v. Blake, 578 U.S. ___, 136 S. Ct. 1850 (2016)**

- The U.S. Supreme Court held that when a statute requires exhaustion of "such administrative remedies as are available," remedies that are officially "on the books" do not need to be exhausted if they are not truly available in practice.

- The Court identified three situations in which remedies may be "unavailable":

1. When the remedy operates as a dead end — officials are unwilling or consistently unable to provide relief.

2. When the administrative scheme is so opaque that no ordinary person can discern how to use it.

3. When administrators thwart people from using the remedy via misrepresentation, intimidation, or misdirection.

- Wilson v. MVM, Inc., 475 F.3d 166 (3d Cir. 2007)

- In this case, plaintiffs attempted to use administrative remedies but received only poor or no response from their employer. They argued further exhaustion would be futile. The court required a "clear and positive showing" of futility before excusing exhaustion.

- Mullins Coal Co. v. Clark, (7th Cir.)

- In that case, the district court's decision was excused from the exhaustion requirement where further action would be futile — because the agency had not acted on similar applications and had provided no relief.

- **Medina v. Public Utility Dist. No. 1 of Benton Cnty., 147 Wn.2d 303, 53 P.3d 993 (2002).**

  Holding/Principle: Washington Supreme Court recognizes the notice purpose of RCW 4.96.020 — the tort-claim statute exists to give local governments the opportunity to investigate and settle claims, and courts will examine whether the purpose of notice was satisfied. Medina explains the requirement for presentment but clarifies the statutory purpose.

- Washington law recognizes that the central purpose of the notice statute (RCW 4.96.020) is to give the government notice and an opportunity to investigate and settle claims.

Medina v. PUD No.1, 147 Wn.2d 303 (2002). Plaintiff's repeated written reports, HR complaints, DEI filings, and demand letters (Exhibits A–E) provided UW with ample notice, and UW's failure to respond deprived Plaintiff of timely guidance and prevented meaningful administrative resolution.

- **Millay v. Cam (also cited as Millay v. Can), 135 Wn.2d 193, 955 P.2d 791 (1998) (equitable tolling standard).** Holding/Principle: Washington Supreme Court recognizes equitable tolling in civil cases in extraordinary circumstances where justice requires it — courts consider (a) plaintiff diligence; (b) defendant bad faith, deception, or false assurances; (c) consistency with the statute's purpose; and (d) that tolling is necessary for justice. Millay is the controlling Washington standard for equitable tolling.

- **O'Donoghue v. State, 66 Wn.2d 787, 405 P.2d 258 (1965).** Holding/Principle: The Washington Supreme Court has long held that notice statutes should not be used as procedural traps to defeat legitimate claims where the state had actual notice of the facts and was not prejudiced. O'Donoghue endorses fairness and actual notice as controlling considerations. The Washington Supreme Court has cautioned that notice statutes are not intended to defeat legitimate claims where the government had actual notice of the facts. O'Donoghue v. State, 66 Wn.2d 787 (1965). Here, UW had actual notice of Plaintiff's allegations for years through repeated reports and communications, and UW suffered no prejudice by the timing of Plaintiff's ORM filing.

- **RCW 4.96.020 — Presentment and filing of claims against local governmental entities.** Statute (useful text): RCW 4.96.020 requires presentment of a claim and sets content and timing requirements — but the statute's purpose is notice and opportunity to investigate. Courts have repeatedly interpreted the statute with attention to the purpose of

notice and have applied equitable doctrines where appropriate. Exhaustion of Remedies and Equitable Tolling Exhaustion is required only for administrative remedies that are genuinely available. Ross v. Blake, 578 U.S. ___, 136 S. Ct. 1850, 1858–60 (2016). The record establishes that the University of Washington's internal processes were effectively unavailable: Plaintiff repeatedly made detailed complaints to supervisors, Human Resources, Diversity Equity & Inclusion, and UCIRO (Exhibits A–E) and received either no response or only procedural deflection. The institution's own inaction and opacity rendered those procedures a "dead end."

- Moreover, UW's counsel did not inform Plaintiff of the requirement to file a tort claim with the Washington State Office of Risk Management until September 26, 2025—after this action was filed—thereby thwarting any opportunity to utilize that process in a timely manner. Under Ross, exhaustion is excused when administrators thwart access to relief or make the administrative scheme unduly opaque. The University's seven-month silence and its belated instruction to file an ORM claim fall squarely within the Ross exceptions. In addition, equitable tolling applies where justice requires it and the plaintiff has been diligent while the defendant has acted in bad faith, provided false assurances, or concealed necessary information. Millay v. Cam, 135 Wn.2d 193, 206–07, 955 P.2d 791 (1998). Plaintiff acted with diligence and promptly filed the ORM claim upon learning of the requirement; UW's long silence and late-breaking demand for a tort claim constitute precisely the kind of conduct that prevents timely compliance and justifies tolling of any presuit deadline. Washington courts also continue to recognize that the purpose of RCW 4.96.020 is notice, not procedural entrapment. Hanson v. Carmona, No. 22-2-12865-8 SEA (King Cnty. Super. Ct. 2023); Medina v. Pub. Util. Dist. No. 1 of Benton Cnty., 147

Wn.2d 303, 310–11, 53 P.3d 993 (2002); Brigham v. City of Seattle, 34 Wn. App. 92, 94–95 (1983). These authorities reaffirm that substantial compliance and actual notice satisfy the statute's purpose where, as here, the public entity had months of detailed notice and a full opportunity to investigate. Taken together, Ross, Millay, Hanson, Medina, and Brigham establish that exhaustion and notice requirements cannot be used to penalize a claimant who has done everything reasonably possible to alert officials and seek redress in good faith. UW's own obstruction and neglect created the procedural defect it now attempts to exploit; equity and precedent require that exhaustion be deemed satisfied or excused.

## EQUITABLE AND LEGAL SUPPORT

Washington law and federal precedent require liberal construction and equitable consideration where a claimant has substantially complied with notice and exhaustion requirements.

- RCW 4.96.020(5) mandates that claim statutes be liberally construed so substantial compliance satisfies procedural requirements. Plaintiff's multiple written complaints, HR reports, DEI communications, and demand letters provided the University ample notice and opportunity to investigate, thereby meeting the statute's essential purpose.

- Federal equity parallels these principles. In Haines v. Kerner, 404 U.S. 519 (1972), the Supreme Court held that pro se pleadings must be liberally construed and not dismissed for technical errors. Balistreri v. Pacifica Police Dep't, 901 F.2d 696 (9th Cir. 1990), reiterates that the pro se litigant must be given the benefit of any doubt. In Felder v. Casey, 487 U.S. 131 (1988), the Court struck down state notice-of-claim statutes applied to § 1983 actions, holding that state procedures cannot obstruct federal rights. And Ross v.

Blake, 578 U.S. 632 (2016), clarified that exhaustion applies only to remedies that are "available"; when officials thwart or withhold access, exhaustion is excused.

- Here, UW's prolonged silence and misdirection rendered administrative remedies effectively unavailable. Defendants cannot exploit their own failure to respond as a defense. Plaintiff's conduct demonstrates diligence and substantial compliance, entitling her to equitable consideration and full adjudication on the merits

### VI. EQUITABLE RELIEF

**12.** In addition to legal damages, Plaintiff seeks equitable relief to redress systemic failures at UW that allowed harassment and retaliation to persist. The relief sought is narrowly tailored and intended to remedy ongoing risk to employees and to ensure institutional accountability.

**Requested Equitable Remedies:**

a. A court-ordered audit of UW Medical Center's HR and DEI investigative procedures, to be conducted by an independent monitor with expertise in employment discrimination and Title VII compliance.

b. Implementation of mandatory supervisory training on discrimination, retaliation, de-escalation, and accommodation procedures, with periodic reporting to the Court for a term of three (3) years.

c. Revision of UW's internal complaint intake and investigation timelines, including enforceable interim protective measures for complainants (e.g., temporary reassignment, safety plans, and no-contact directives).

d. Expungement or correction of adverse performance entries and disciplinary records attributable to retaliatory conduct and a formal statement of corrective action in Plaintiff's personnel file.

e. Institution of a confidential reporting mechanism with external oversight to ensure

complaints of harassment and assault are promptly escalated and investigated.

**13.** These equitable remedies are necessary because monetary damages alone cannot fully redress

the institutional failure and ongoing risk to employees. Structural relief will prevent recurrence

and provide systemic protections, consistent with the remedial powers of this Court under its

equitable jurisdiction.

## VII. DAMAGES AND PRAYER FOR RELIEF

**14.** Plaintiff seeks compensatory damages for lost earnings, lost benefits, emotional distress, and

harm to professional reputation. Plaintiff also seeks punitive damages against individual

Defendants in the amount of $5,000,000 each, due to reckless, intentional, and malicious conduct

that disregarded Plaintiff's federally protected rights.

**15.** The requested total damages of $75,000,000 are proportional and justified by the following:

(a) the chronicity and severity of discriminatory practices dating back over a decade; (b) the

physical assault by a supervisory staff member and the University's repeated refusal to remediate;

(c) the substantial economic harm including lost promotions, wages, and professional

opportunities; (d) the need for deterrence to prevent future institutional misconduct; and (e)

Plaintiff's significant non-economic harms, including medical and psychological treatment

necessitated by the assault and ongoing hostility.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

### DAMAGES AND EQUITABLE RELIEF REQUESTED

Plaintiff has sustained severe and continuing harm as a direct result of Defendants' conduct. The harassment, discrimination, and retaliation she endured caused significant emotional distress, loss of professional reputation, interruption of her nursing career, and deterioration of health. She has been forced to take medical leave, forgo advancement, and bear financial losses measured in the hundreds of thousands of dollars in wages, benefits, and retirement contributions.

Plaintiff seeks:

1. Back Pay and Front Pay. All wages, benefits, and retirement credits lost as a result of discriminatory and retaliatory conduct, together with prejudgment interest.

2. Compensatory Damages. Reimbursement for emotional distress, humiliation, pain, suffering, and loss of enjoyment of life stemming from Defendants' actions.

3. Declaratory Relief. A judicial declaration that Defendants violated Plaintiff's rights under USERRA, Title VII, the ADA, the ADEA, §§ 1981 and 1983, and the Washington Law Against Discrimination.

4. Injunctive Relief. Orders requiring the University of Washington to:

   o institute anti-retaliation and anti-discrimination training for supervisors and staff;

   o reform its internal grievance, DEI, and HR procedures to provide independent oversight; and

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 37

> o  remove all adverse records related to Plaintiff's protected complaints.

5.  Punitive Damages.  $5,000,000 in punitive damages against Defendants Haverland, Janke, and Ramirez, jointly and severally, for malicious and reckless indifference to Plaintiff's federally protected rights.

6.  Compensatory Total.  $75,000,000 in total compensatory damages against all Defendants.

7.  Attorneys' Fees and Costs.  An award of reasonable fees and litigation expenses under 42 U.S.C. § 1988(b) and 38 U.S.C. § 4323(h).

8.  Any Other Relief the Court deems equitable and just in light of the record and public policy favoring accountability for systemic discrimination.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully demands trial by jury on all issues so triable.

## CONCLUSION

Plaintiff brings this action not only to redress her own injuries but also to compel institutional accountability within the University of Washington.  For more than a decade, she has repeatedly engaged with every available administrative process, only to meet silence, deflection, or retaliation.  The Defendants' pattern of neglect and retaliation offends both federal and state law and the principles of fairness those laws embody.

Equity requires that this matter proceed to discovery and trial so the evidence may be fully examined by a jury of Plaintiff's peers.  The University and its agents must be held to the same standards of transparency and justice they claim to uphold.

DATED this 15 day of October , 2025.


Respectfully submitted,

Chisula Chambers
Chisula Chambers
Pro Se Plaintiff
P.O. Box 112163
Tacoma, WA 98411
ChisulaChambers@hotmail.com

FIRST AMENDED COMPLAINTJURY TRIAL DEMANDED - 39



**VET CENTER** EST. 1979

Connection.
Camaraderie.
Community.

To Whom It May Concern,

I'm writing this letter on behalf of Ms Chisula Chambers (last 4 of Soc. Sec.: 9655) in her application for FMLA benefits and in support of the findings of Wildyana (Willy) Lafond, LMHC, LMFT. I am a clinical psychologist and have specialized in the treatment of PTSD since I graduated with my Ph.D. in 1995 from the University of Kansas clinical psychology program. The whole of my professional career has been spent working in the VA system. Since 2001, I have worked at the Seattle Vet Center. I was initially hired as the Clinical Coordinator and in 2019 was hired to become the Director.

Subsequent to taking the position of Director at this Vet Center, I hired Willy Lafond to work as a therapist at this Vet Center specializing in both individual treatment, as well as the treatment of couples and families. I have supervised her throughout her time here and have consulted with her routinely on her cases. I fully concur with her conclusions in this matter and have no hesitation in co-signing this application for FMLA benefits for Chisula Chambers.

Sincerely,

Arthur T. Satterfield, Ph.D.
Director
Seattle Vet Center
305 S. Lucile St.
Seattle, WA 98108
206-764-5130 (office)
206-764-5131 (fax)



 **Gmail**

**Office of Wazir <officeofwazir@gmail.com>**

---

## Fwd: Fw: Scheduling
1 message

**Vizir Secretariat** <vizirsecretariat@gmail.com>                                  Tue, Feb 11, 2025 at 4:46 AM
To: Office of Wazir <officeofwazir@gmail.com>

---------- Forwarded message ---------
From: **Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 4:01 AM
Subject: Fw: Scheduling
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

---

From: Chi Chambers <chamcx3@uw.edu>
Sent: Friday, March 17, 2023 5:51 PM
To: Moriah Janke <moriah3@uw.edu>
Subject: Re: Scheduling

Just trying to get guidance for a strategy or some structure. So, does that mean 15 night flex shifts (8) and one day flex shift (12)? How do you do that math for a 0.825 FTE - 24 Hrs for EDI?

---

From: Moriah Janke <moriah3@uw.edu>
Sent: Friday, March 17, 2023 2:18 PM
To: Chi Chambers <chamcx3@uw.edu>
Subject: Re: Scheduling

Hi Chi,

I know we couldn't give you any flex shifts for the 3/20-4/16 schedule period, because of how you scheduled Fridays & Saturdays, which would put you in to short break pay...

Regarding the current schedule we're working on (4/17-5/14), I saw you scheduled primarily for Thursdays/Fridays, which will definitely be easier to schedule flex with. We do have approximately 10 nurses, including you, that like doing flex shifts...so it comes down to the balance of making sure everyone gets a chance to do some flex shifts without messing with people's schedules too much.

You can always do night flex, currently Dorothy is the only one who consistently does it, that's why she works M-W, but she is not in a patterned position.

I always look over the schedule with Julie before final posting & help with any troubleshooting.

Hopefully this clears some things up. Let me know if you have any other questions.

-Moriah

**Moriah Janke BSN RN-BC (She/Her) | Assistant Nurse Manager**
5E Surgical Intensive Care Unit

 **Gmail**

Office of Wazir <officeofwazir@gmail.com>

---

## Fwd: Attorney-Client Privilege

1 message

**Vizir Secretariat** <vizirsecretariat@gmail.com>          Sat, Feb 15, 2025 at 5:17 PM
To: Office of Wazir <officeofwazir@gmail.com>, officeofvizir@gmail.com

---------- Forwarded message ---------
From: **Chisula Chambers** <chisulachambers@hotmail.com>
Date: Fri, Feb 14, 2025 at 12:23 AM
Subject: Re: Attorney-Client Privilege
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

The "Initial Reqiest" has all of these names on it:

Erika A. Goldstein David Acosta Victoria Gardner Felicity Abeyta-Hendrix Mary Walls Pam Racansky Estelle Williams Renata Thronson Anne Eacker Jane Distad Ashley Jefferson Michael Ryan Ellen Cosgrove Amen Tsegai Jon McGough Emma Williams Jason Green Liz Lococo Charles Merideth Karen McDonough Julie Calcavecchia Jamey Cheek 1 of 2 Joanne Estacio-Deckard Sarah E. Wood Kali E. Wagner Emily Slager Paul G. Ramsey Diane Noecker Tabitha Fletcher Rick Arnold Michelle Terry Valeria Diaz Milu Worku drstest@uw.edu Francine Powel Jennifer Gross Niki Meyers Fischer drsnotes@uw.edu KaPe Portante Connie Lamb Nasya Si Kimeshia Thomas Ma_hew Stolzberg Sharlay Butler Tim Ball Jenny Price Erika Brandon Faraday ChrisPna Williams Leslie Blair

This also includes leadership and employees from the UWSOM and Sea4le Cancer Care Alliance.

*With Gratitude,*

**Chisula Chambers**

---

From: Chisula Chambers <chisulachambers@hotmail.com>
Sent: Thursday, February 13, 2025 11:20 PM
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>
Subject: Fw: Attorney-Client Privilege

My SUPERIOR COURT records and documents for the FOIA case I submi4ed on my own and then found a lawyer to seal the deal. AG response.

*With Gratitude,*

**Chisula Chambers**

---

 Gmail

Office of Wazir <officeofwazir@gmail.com>

---

## Fwd: Fw: Telling on myself
1 message

**Vizir Secretariat** <vizirsecretariat@gmail.com>    Tue, Feb 11, 2025 at 4:47 AM
To: Office of Wazir <officeofwazir@gmail.com>

---------- Forwarded message ---------
**From: Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 4:04 AM
Subject: Fw: Telling on myself
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

---

**From:** Marlowe A Ramirez <ramirez2@uw.edu>
**Sent:** Tuesday, August 3, 2021 7:17 PM
**To:** Chi Koumbassa <chamcx3@uw.edu>
**Subject:** Re: Telling on myself

I understand.
Marlowe

*Marlowe Ramirez BSN, RN, CCRN*
*5E-Assistant Nurse Manager*
*University of Washington Medical Center*
*1959 Pacific Ave NE, Seattle WA 98195*
*ph: 206-598-9985*
*email: ramirez2@uw.edu*
*Mailbox: 356082*
*Office Location: cc530*

**From:** Chi Koumbassa <chamcx3@uw.edu>
**Sent:** Tuesday, August 3, 2021 4:48 AM
**To:** Marlowe A Ramirez <ramirez2@uw.edu>
**Subject:** Re: Telling on myself

No. I'd like to see if I can manage this myself first. If things get out of control, then I return to you abs seek support from management. Thank you.

CK
We Heal Together

Sent from iOS

**From:** Marlowe A Ramirez <ramirez2@uw.edu>
**Sent:** Monday, August 2, 2021 1:55:29 PM
**To:** Chi Koumbassa <chamcx3@uw.edu>
**Subject:** Re: Telling on myself

Hi Chi,
I'm so sorry about your experience with Laurie. I'm glad though that you brought it up.

CK
We Heal Together

Sent from iOS

.

 **Gmail**

Office of Wazir <officeofwazir@gmail.com>

---

## Fwd: Fw: Jokes aside
1 message

---

**Vizir Secretariat** <vizirsecretariat@gmail.com>          Tue, Feb 11, 2025 at 4:46 AM
To: Office of Wazir <officeofwazir@gmail.com>

---

---------- Forwarded message ----------
From: **Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 4:03 AM
Subject: Fw: Jokes aside
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

---

**From:** Chi Koumbassa
**Sent:** Sunday, February 13, 2022 7:01 PM
**To:** Marlowe A Ramirez <ramirez2@uw.edu>
**Subject:** Jokes aside

Marlowe,
You once said a joke that "racism is everywhere!" Even the snow is racist.

For me, racism is everywhere and I'm met with it daily.

Yesterday, at shift report, I was simply stretching, still waking up a bit. A nurse called out, "hey Chi, you look like you're ready for a fight."

Research shows that white people see black people as more aggressive especially black women. My simply stretching looks like a battle cry to a white woman.

My daily...

Amy would rather I have conversations. But so, so much of this occurs that it's hard to collect and share at the random times someone has time and availability.
CK
We Heal Together

Sent from iOS

 Gmail

Office of Wazir <officeofwazir@gmail.com>

## Fwd: Fw: EXTENDED2 Approved Continuous FMLA Leave: Chisula Chambers 852005554

1 message

**Vizir Secretariat** <vizirsecretariat@gmail.com>        Tue, Feb 11, 2025 at 4:44 AM
To: Office of Wazir <officeofwazir@gmail.com>

---------- Forwarded message ---------
From: **Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 3:58 AM
Subject: Fw: EXTENDED2 Approved Continuous FMLA Leave: Chisula Chambers 852005554
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

.

From: Jennifer Klohe <klohej@uw.edu>
Sent: Friday, September 29, 2023 7:28 AM
To: Chi Chambers <chamcx3@uw.edu>
Subject: RE: EXTENDED2 Approved Continuous FMLA Leave: Chisula Chambers 852005554

Hi Chisula,

The UW does not have short term disability, but there is long-term disability (LTD) insurance. The benefits office can help with questions about this.

**LTD Insurance info:** https://hr.uw.edu/benefits/insurance/other/long-term-disability-insurance

**Any questions, Contact:**

|  |  |  |
|---|---|---|
| **Benefits**<br>206-543-4444<br>benefits@uw.edu | or | **Integrated Service Center (ISC)**<br>https://isc.uw.edu/contact-us/<br><br>▪ **Email:** ischelp@uw.edu<br><br>▪ **Phone:** 206-543-8000 |

Hope that helps. Thank you,

10/14/25, 5:03 PM

Case 2:25-cv-01662-JNW  Gmail - Fwd: EXTENDED2 Approved Continuous FMLA Leave: Chisula Chambers 852005554
Document 9   Filed 10/15/25   Page 47 of 84

Cc: 'prservices@uw.edu' <prservices@uw.edu>
Subject: RE: EXTENDED2 Approved Continuous FMLA Leave: Chisula Chambers 852005554

Hello all –

Attached is Chisula's leave approval extension letter, and FMLA exhaustion letter.

Let me know if you have any questions. Thank you,

**Jennifer Klohe**

*uw.edu*

**HR Leave Specialist**

Human Resources | UW Medicine

1959 NE Pacific #BB150 | Box 356054| Seattle, WA 98195
**PHONE:**   206.598.4148   **FAX:** 206.598.4610

**TEAM EMAIL:**   medctrfmla@uw.edu

**HOURS:** Monday -Friday 4:30 AM – 12:30 PM PST (7:30 AM – 3:30 PM EST)

*Upcoming Out of Office Dates:*

The above email may contain patient identifiable or confidential information. Because email is not secure, please be aware of associated risks of email transmission. If you are a patient, communicating to a UW Medicine Provider via email implies your agreement to email communication; see http://www.uwmedicine.org/ Global/Compliance/EmailRisk.htm

The information is intended for the individual named above. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited.  Please notify the sender by reply email, and then destroy all copies of the message and any attachments.  See our Notice of Privacy Practices at www.uwmedicine.org.

**From:** Jennifer Klohe
**Sent:** Monday, August 14, 2023 8:28 AM
**To:** Amy E. Haverland <havrilla@uw.edu>; Julie Cantero-Valente <canteroj@uw.edu>; Elizabeth M Domingo <emdoming@uw.edu>; Chi Chambers <chamcx3@uw.edu>
**Cc:** 'prservices@uw.edu' <prservices@uw.edu>
**Subject:** EXTENDED2 Approved Continuous FMLA Leave: Chisula Chambers 852005554

Hello all –

Attached is Chisula's leave approval extension letter.

**HR Leave Specialist**

Human Resources | **UW Medicine**

1959 NE Pacific #BB150 | Box 356054| Seattle, WA 98195
**PHONE:**   206.598.4148    **FAX:** 206.598.4610

**TEAM EMAIL:**   medctrfmla@uw.edu

**HOURS:** Monday -Friday 4:30 AM – 12:30 PM PST (7:30 AM – 3:30 PM EST)


*Upcoming Out of Office Dates:*


The above email may contain patient identifiable or confidential information. Because email is not secure, please be aware of associated risks of email transmission. If you are a patient, communicating to a UW Medicine Provider via email implies your agreement to email communication; see http://www.uwmedicine.org/ Global/Compliance/EmailRisk.htm


The information is intended for the individual named above. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited. Please notify the sender by reply email, and then destroy all copies of the message and any attachments. See our Notice of Privacy Practices at www.uwmedicine.org.


**image001.png**
1K

 **Gmail**        **Office of Wazir <officeofwazir@gmail.com>**

---

## Fwd: Fw: [Update} RE: Names
1 message

---

**Vizir Secretariat** <vizirsecretariat@gmail.com>       Tue, Feb 11, 2025 at 4:43 AM
To: Office of Wazir <officeofwazir@gmail.com>

---------- Forwarded message ---------
**From: Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 3:58 AM
Subject: Fw: [Update} RE: Names
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

In the Zoom he blamed me for everything.

---

**From:** Julius Pasco <jpasco@uw.edu>
**Sent:** Thursday, August 10, 2023 3:47 PM
**To:** Chi Chambers <chamcx3@uw.edu>
**Subject:** RE: [Update} RE: Names

Chi,


Sounds good.  I just sent a zoom invite/link for 1:30 pm tomorrow. I'll see you then!


Thanks,


Julius




**From:** Chi Chambers <chamcx3@uw.edu>
**Sent:** Thursday, August 10, 2023 12:39 PM
**To:** Julius Pasco <jpasco@uw.edu>
**Subject:** Re: [Update} RE: Names


I am available any time after 1:30pm. Thank you.


*Thank you,*


**Chisula Chambers, MPH, BSN, RN**

Justice, Equity, Diversity, Inclusion Facilitator

EDI Bias Consultant

EDI Bias Consultant

5E Surgical Intensive Care Unit Staff Nurse

**UWMC Montlake** - 1959 NE Pacific Street

Seattle, WA 98195 - **Chamcx3@uw.edu**

**From:** Julius Pasco <jpasco@uw.edu>
**Sent:** Tuesday, August 8, 2023 2:02:33 PM
**To:** Chi Chambers <chamcx3@uw.edu>
**Subject:** RE: {Update} RE: Names


Hi Chi,


Amy and I have completed our investigation. I'd like to set up a time with you at your convenience to discussion. Below is my availability for the rest of this week. Could you please let me know what date/time works best for you and I'll confirm a meeting by sending you a calendar/zoom invite?


- Wednesday (8/9) – Available after 1 pm.
- Thursday (8/10) – Available between 2 – 3 pm.
- Friday (8/11) – Available any time.


Thanks,


Julius Pasco

Human Resources Consultant

UW Medical Center

Office: (206) 598-1946

Mobile: (619) 726-4708

*Telework Hours: 8:00 am – 4:30 pm Monday – Friday*

*Upcoming Out of Office Dates:*


**From:** Chi Chambers <chamcx3@uw.edu>
**Sent:** Thursday, July 20, 2023 11:00 AM
**To:** Julius Pasco <jpasco@uw.edu>
**Cc:** Amy E. Haverland <havrilla@uw.edu>
**Subject:** Re: {Update} RE: Names


Thank you for the update.

Lauri

Sam

Janet

Ari

Brandal

Ugo

Suzanna

Alysia

(Wendy's Husband) on night shift


As I have said before, I do not know the cause of these rapid shifts to anger. I even heard someone (Ugo) say that he hates me. These people do not know me. We do not hang outside of work. They barely speak to me at work. I overhear them analyzing my every move - when I go to lunch (too late), how I have lost my desk fan (disorganized), when I called the charge nurse a "coach" because she is training nurses (that's new).


These comments are openly spoke in the hallways assuming I cannot hear. Some do not care that I can hear. If I turn the corner too soon or walk out of the breakroom, I hear negative comments, rolled eyes, whispers suddenly stop.


Gaslighting: When I confront people, they turn on smiles, fake friendliness, and deny all ill-intent. As soon as I turn or leave, they are rolling their eyes and back to gossiping and complaining. I just don't get it.


Not everyone has been as blatantly contributing towards actively bullying me. Some just carry the rumor forward and shut me out, withdraw their help, and act like I am not there (if they can hide their anger).


These are names that come to me clearly. I do not know everyone's last name. Amy may be a resource.


*With gratitude,*

*Chi*


*Diversity is not the acceptance of the Black/Brown assimilated and acculturated person. True diversity is genuinely accepting, embracing, and celebrating that a person thinks, dresses, emotes, expresses, communicates, prioritizes, and operates in a way that is entirely foreign from you. Work daily on suppressing your fear and negativity about what*

 Gmail

Office of Wazir <officeofwazir@gmail.com>

---

## Fwd: Fw: Welcome to the EDI Committee!

1 message

**Vizir Secretariat** <vizirsecretariat@gmail.com>              Tue, Feb 11, 2025 at 4:41 AM
To: Office of Wazir <officeofwazir@gmail.com>, officeofvizir@gmail.com

---------- Forwarded message ---------
From: **Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 3:57 AM
Subject: Fw: Welcome to the EDI Committee!
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

---

**From:** Esmeralda Pulido <epulido1@uw.edu>
**Sent:** Wednesday, March 15, 2023 3:06 PM
**To:** Tracy Hirai-Seaton <thirai@uw.edu>; Chi Chambers <chamcx3@uw.edu>
**Cc:** Elaine Acacio <acacioe@uw.edu>
**Subject:** RE: Welcome to the EDI Committee!

Ditto!! Welcome to the committee Chi. We are so lucky to have you! I look forward to meeting you in person soon.

Best,

Esme

**From:** Tracy Hirai-Seaton <thirai@uw.edu>
**Sent:** Wednesday, March 15, 2023 9:35 AM
**To:** Chi Chambers <chamcx3@uw.edu>
**Cc:** Elaine Acacio <acacioe@uw.edu>; Esmeralda Pulido <epulido1@uw.edu>
**Subject:** Re: Welcome to the EDI Committee!

Welcome (officially) to the committee! Hope you can attend this month's meeting on Friday and join the rest of the new members in April's meeting. We are really glad you are joining us and our efforts!

All the best,

Tracy

**From:** Chi Chambers <chamcx3@uw.edu>
**Sent:** Tuesday, March 14, 2023 3:45 PM
**To:** Tracy Hirai-Seaton <thirai@uw.edu>
**Cc:** Elaine Acacio <acacioe@uw.edu>; Esmeralda Pulido <epulido1@uw.edu>
**Subject:** Re: Welcome to the EDI Committee!

10/14/25, 5:05 PM                    Gmail - Fwd: Fw: Welcome to the EDI Committee!

Case 2:25-cv-01862-JNW    Document 9    Filed 10/15/25    Page 53 of 84

Muna Dahir, Gastric Surgery Technician, Montlake

Andrea Dotson, Assistant Director, Patient & Family Education, Patient & Family Centered Care

TJ Drammeh, Certified Nursing Assistant, Northwest

Enedina Dumas, Strategic Outreach Manager, Center for OB/GYN & Pediatrics

Kim Garner, Associate Director, Laboratory Medicine & Pathology

Sumona Das Gupta, Director, Pharmacy Administration

Amy Haverland, Nurse Manager, 5E Critical Care, Montlake

Sam Lipscomb, Manager of Program Operations, Operating Room, Northwest

Tiffany Megargee, Occupational Therapist II, Sports Therapy, Northwest

Jessica Muhamad, Medical Assistant, Medical Specialty Clinic, Montlake

Bridget O'Connor, Nurse Care Coordinator, Northwest

Tokunbo Olukoya, Manager of Program Operations, Clinical Engineering, Northwest

Julie Reed, Manager, Admitting

Thom Schessler, Applications Analyst III

Nancy Colobong Smith, Clinical Nurse Specialist, Renal & Transplant

Lorie Williams, Clinic Patient Services Specialist, Northwest


Administrative Support:  Amy Yamamoto

Executive Sponsor: Dr. Santiago Neme



*UW Medicine Healthcare Equity: https://depts.washington.edu/uwmedptn/strategies-programs/healthcare-equity/*



**Tracy Hirai-Seaton, MSW, LICSW**


**Patient Liaison / Clinical Analyst**

**Clinical Risk Management | UW Medicine**

**UWMC EDI Co-chair**

1959 NE Pacific Street | Box 357255 | Seattle, WA 98195-6153

OFFICE: 206-598-5874

**EMAIL:**  thirai@uw.edu   **WEB:** uwmedicine.org

**Pronouns** | She, Her, Hers

 **Gmail**

Office of Wazir <officeofwazir@gmail.com>

## Fwd: Fw: Pt Concern + Hours
1 message

**Vizir Secretariat** <vizirsecretariat@gmail.com>                                    Tue, Feb 11, 2025 at 4:40 AM
To: Office of Wazir <officeofwazir@gmail.com>, officeofvizir@gmail.com

---------- Forwarded message ---------
From: **Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 3:56 AM
Subject: Fw: Pt Concern + Hours
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

**From:** Amy E. Haverland <havrilla@uw.edu>
**Sent:** Friday, January 27, 2023 8:58 AM
**To:** Chi Chambers <chamcx3@uw.edu>
**Subject:** RE: Pt Concern + Hours

Hi Chi,

While not required, sometimes an explanation of what is going is very helpful. It can be human to complete stories when we only have a limited amount of information. Context always helps me understand a situation better. I am not worried about intermittent incremental OT. I just know staff are really tired at the end of 12.5+ hrs. and want to get home.

Thank you for taking the time to write the PSN. I will say that the PSN is at a level of detail that is beyond my expertise, and I will need to reach out to our Infection Prevention (IP) colleagues for comment and recommendations. My microbiology knowledge is really lacking.

What I do know is that we are about to start a major push in our education and support of Quality (Pressure injury and CLABSI). This will start next week, but we will start looking at all lines, tubing, skin, etc. We will start with Leadership rounding (because we have the most flexible schedules) and will work in scheduling bedside staff by the next schedule. (Let us know if that is something you might be interested in. We are going to be building it as we start doing this so it will feel clunky at first)

I am not bothered if you ever need to remind me to check in on the follow up in this case. I suspect that we won't get an answer right away from IP as they have a long list of cases in review. It is still important to get answers.

Thank you,

Amy


Amy Haverland MN RN CCRN |

Nurse Manager 5E Surgical Intensive Care Unit

*Diversity is not the acceptance of the Black/Brown assimilated and acculturated person. True diversity is genuinely accepting, embracing, and celebrating that a person thinks, dresses, emotes, expresses, communicates, prioritizes, and operates in a way that is entirely foreign from you. Work daily on suppressing your fear and negativity about what you do not yet know or understand. You do a disservice to diversity and the potential of our collective intelligence when you fail to operate at a higher level.*

**Chisula Chambers, MPH, BSN, RN**

5E Surgical Intensive Care Unit

University of Washington Medical Center

*"It is an act of courage to be your authentic self, even when there is zero approval."*

*"When a flower doesn't bloom, you fix the environment in which it grows, not the flower."*

---

**3 attachments**

 **image001.png**
6K

 **image002.png**
14K

UW Medicine **image003.gif**
3K

 Gmail

Office of Wazir <officeofwazir@gmail.com>

## Fwd: Fw: Traumatic Experience
1 message

**Vizir Secretariat** <vizirsecretariat@gmail.com>                                   Tue, Feb 11, 2025 at 4:38 AM
To: Office of Wazir <officeofwazir@gmail.com>, officeofvizir@gmail.com

---------- Forwarded message ---------
From: **Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 3:52 AM
Subject: Fw: Traumatic Experience
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

---

**From:** Cindy Sayre <casayre@uw.edu>
**Sent:** Tuesday, August 23, 2022 12:34 PM
**To:** Chi Koumbassa <chamcx3@uw.edu>
**Cc:** Kellie Garth Green <kgarth@uw.edu>; Amy E. Haverland <havrilla@uw.edu>
**Subject:** Re: Traumatic Experience

Thank you!!


**Cindy Sayre, PhD, RN**

**Chief Nursing Officer**
**Senior Associate Administrator, Patient Care Services**
University of Washington Medical Center | UW Medicine
1959 NE Pacific Street | Box 356151 | Seattle, WA 98195-6151
**OFFICE:** 206.598.6913  **EMAIL:** casayre@uw.edu  **WEB:** uwmedicine.org




This message, and any attachments to it, is protected by coordinated quality improvement/ risk management/ peer review confidentiality under RCW 70.41.200/ 4.24.250/ 43.70.510. Privileged, confidential, patient identifiable information also may be contained in this message. Because
email is not secure, please be aware of associated risks of email transmission. This information is meant only for the use of the intended recipients. If you are not the intended recipient, or if the message has been addressed to you in error, do not read, disclose, reproduce, distribute, disseminate or otherwise




This message, and any attachments to it, is protected by coordinated quality improvement/ risk management/ peer review confidentiality under RCW 70.41.200/ 4.24.250/ 43.70.510. Privileged, confidential, patient identifiable information also may be contained in this message. Because
email is not secure, please be aware of associated risks of email transmission. This information is meant only for the use of the intended recipients. If you are not the intended recipient, or if the message has been addressed to you in error, do not read, disclose, reproduce, distribute, disseminate or otherwise
use this transmission. Instead, please notify the sender by reply email, and then destroy all copies of the message and any attachments. See also UW Medicine's Notice of Privacy Practices at http://uwmedicine.
washington.edu/Global/Legal/privacy.htm.

---

**4 attachments**



Outlook-ecincuxj.png
37K



Outlook-ltxfuxc5.png
50K



Outlook-bifmh3lc.png
37K



Outlook-dp5l1qyq.png
50K

 Gmail

**Office of Wazir <officeofwazir@gmail.com>**

---

## Fwd: Fw: Let's consider for a moment
1 message

**Vizir Secretariat <vizirsecretariat@gmail.com>**        Tue, Feb 11, 2025 at 4:37 AM
To: Office of Wazir <officeofwazir@gmail.com>, officeofvizir@gmail.com

---------- Forwarded message ---------
From: **Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 3:52 AM
Subject: Fw: Let's consider for a moment
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

---

**From:** Chi Koumbassa
**Sent:** Tuesday, August 16, 2022 3:27 PM
**To:** sicu5E@uw.edu <sicu5e@uw.edu>
**Cc:** Amy E. Haverland <havrilla@uw.edu>
**Subject:** Let's consider for a moment

Today, I was called a Nigger in the SICU.

As nurses, when we have traumatic or unusual experiences, we talk about them. We confide in our coworkers to process and unpack the things that do not feel good regularly, except for racism. Any topic, from an unruly patient to a code to staffing concerns, is open for discussion. But not the experiences that cause me, particularly the most moral distress.

A few of my SICU coworkers have been open to discussing my nursing and human experiences as much as the next topic, and I appreciate you. The majority, however, find the issue annoying, distasteful, or maybe even outdated and find the nearest exit, quickly find something else to do, have no words for engagement, or avoid me altogether. Active avoidance is better still than snarky comments, not-so-subtle giggles, and highly aggressive, micro-aggressive comments which involve hints of dog-whistling and gaslighting, which only adds to what I experience now called Racial Battle Fatigue (RBF). You can look up these terms and decide to be an active participant in meaningful change.

At THAT shocking moment of hearing the most hateful word in English, I silently removed my gloves and walked out of the room. Thank you, Kenzie, for speaking up for me when I had no words (tears as I write this). I reported my experience to the charge nurse and just sat silently for what felt like the next hour.

The most traumatic part of my job is not even a "traumatic' code. It is the constant and insidious nature of subconscious individual and systemic bias and racism. Until we have a better way to have these profoundly emotional and painful conversations, please consider that MY experience as a nurse is far from your experience. A fish does not know they swim in the water. Please consider that racism is still real and all around you. Maybe it's hard for you to see it unless it is blatant bigotry. But that is not the case for me. The mindless mention of the n-word brings up centuries of pain buried in my DNA that is impossibly unshakeable. You don't have to talk to me about it either. Nothing performative is being asked of you. You can silently decide to become anti-

 **Gmail**                                    Office of Wazir <officeofwazir@gmail.com>

## Fwd: Fw: Concern - Private
1 message

**Vizir Secretariat** <vizirsecretariat@gmail.com>                 Tue, Feb 11, 2025 at 4:35 AM
To: Office of Wazir <officeofwazir@gmail.com>, officeofvizir@gmail.com

---

---------- Forwarded message ---------
From: **Chi Chambers** <chamcx3@uw.edu>
Date: Mon, Feb 10, 2025, 3:47 AM
Subject: Fw: Concern - Private
To: vizirsecretariat@gmail.com <vizirsecretariat@gmail.com>

---

**From:** Chi Koumbassa <chamcx3@uw.edu>
**Sent:** Monday, August 23, 2021 9:56 PM
**To:** Amy E. Haverland <havrilla@uw.edu>
**Subject:** Re: Concern - Private

Amy,

I guess I feel a little more brave and can be open for sharing. Just as a heads up, I shot an emotional email to Marlowe when some of this all happened. I have since calmed down to reflect and sent you my calm and collected thoughts. So, even if you remove my name, Marlowe will know it was me. Thank you for the offer.

Acknowledging my fears about loud: My past makes me afraid of blow back or retaliation. But I know this management team will do your best to move in the best direction.

-Chisula

CK
We Heal Together

Sent from iOS

---

**From:** Amy E. Haverland <havrilla@uw.edu>
**Sent:** Monday, August 23, 2021 11:25:12 AM
**To:** Chi Koumbassa <chamcx3@uw.edu>
**Subject:** RE: Concern - Private

First, thank you so much for taking the time to write this. Most people do not.  Nothing can be improved without feedback even if it stings.

I will admit that this is going to take me some time to digest (and I have already read the email 3 times) I am saddened that this has been your experience but I have to accept that 5E has some definite room for improvement.

I am happy you shared this with me as I prepare for Staff Education days in the fall so I have time to prepare a discussion of the topics you bring up with the whole staff.  I am 100% certain that you are not alone, but other people don't want to speak up or they convince themselves that it "isn't a big deal".  The teamwork and support of each other on this unit is

booting the noc nurse out of her station to sit and take the report. EVERYONE else seems to wait to receive the report and let the NOC nurse leave or move when ready. I've seen every NOC nurse have this courtesy for day nurses. Why not return respect and courtesy?

When I brought it up, I was called passive-aggressive, and multiple other nurses (assuming her friends) began to be cold towards me. "There are no assigned seats" is what the day nurse told me. But she was very strategic in how she did it. It was a move of control, and we both knew it. I just wasn't supposed to say anything.

I asked one of the nurses: "You seem to be different. Have I offended you?" She laughed and said no. But she continues to be avoidant (a stark change from friendly and open before). I have experienced this before... a run-in with one nurse leading to a wall of avoidance from other nurses.

**My point:** UPC takes time to certify policy and procedure for safe care on the unit. As a people person, I would be interested in some language in guidance on how we treat each other at shift handoffs. And... maybe not just at shift handoffs but in general! I had to take an older nurse aside to ask her not to tell me that what I was doing was "in violation of the Joint Commission" IN FRONT OF THE PATIENTS! That seems like basic professional knowledge to me. Pull me aside and give me the details. What another nurse taught me is not what she learned after a JC visit. I'll take the feedback, but please. I told her that I was dinged for not providing patience with confidence on my evaluation, mostly because OTHER people keep highlighting that I am new in front of the patients.

I don't have ANY of these issues on NOC. Everyone is **very** supportive, willing to teach, and looks out for me tremendously! I am so grateful. There is no cattiness or clique avoidance or undermining or public shaming—just good teamwork. I can imagine that this has been like this for a while. Whether or not this email can lead to better civility or is a document for you understanding what is currently challenging me most at this time, I appreciate you reading. But at this point, I would never desire to work on the day shift with behavior like that. Instead of building up walls to cope with this type of behavior, I'd rather us work towards just having better civility and a culture of respect between shifts. I have always heard, "where there is a lot of women, there will be drama." I don't think we have to accept this without trying to do better.

My two cents...

*With gratitude,*

*Chi*

**Chisula Koumbassa, MPH, BSN, RN**

5E Surgical Intensive Care Unit

University of Washington Medical Center









3:59

150    EA    Elaine

Julius told me they could not do a "climate" interview "What do you think about Chisula". But we all know that this is not what was reported or requested. I don't care how people FEEL about me. I Care that I have a healthy and non-toxic work environment where I can thrive and do my job with the same resources everyone else has. The number 1 resource in the ICU is the team. As soon as Marlowe started spreading rumors, people started avoiding me, failing to help me, I heard someone say they hate me, analyzing everything I do and say, but never talking to me directly, always down the hall and around the corner, behind my back, always negative, too much and not enough. I saw Marlowe speak to someone and she never spoke to me again unless absolutely necessary. She didn't even want to look at me. So, what is he saying such that these people turn red and break their necks to avoid me









3:59 🌙

150    EA    Elaine ›    📹

I'd like to hear from you after your bereavement when your had a chance to speak to HR.

They called me a couple of weeks back to say they have no findings; my allegations are not facts as they have not been corroborated; a "concern" was noted against me as I called attention to my own discomfort under attack as a patient was unstable; my co-workers feel uncomfortable that I am making these allegations... so essentially I am the problem. I have not heard anything from Amy at all. JULIUS actually passed the message from Amy that she is concerned that I would set a boundary or call out their behavior when a patient was unstable. That patient was not in my care. I was assessing whether or not I should leave the floor. So that is misplaced and ridiculous. All of it is ridiculous. So, I extended my leave after learning that HR never even looked into Marlowe















**3:30**    93

EA
BH

**2 People** ›

I should not have taken this patient. I should have follow my gut and went home.

They are talking about PSNs but the patient was not mine. I had not received report yet. Gail said "I need someone to take care of this patient" which was Alysia who was so focused on being catty andnoyahingbthe patient off on me as soon as possible.

I know longer care what is being said about me. Whatever that is being said that can make someone go from friendly and supportive to angry and out of control in thirty minutes is beyond me.

I know we are short-staffed. But this is no longer my burden to carry.

I am not quitting. But this is no longer a safe working environment when I have to perform a bedside timeout for people to regain their



3:29 🌙

150    EA  BH

2 People

iMessage
Jun 18, 2023 at 6:16 PM

I think you need to out me on leave until y'all figure this out. Things have gone from petty to hostile. Farah was peaceful with me all day. When I went on break, there was a whole huddle at the nurses station asni was leaving.

When I came back, Farah was angry and could not contain herself. She was short and blamed "doing three things at once for her behavior. The entire day has been everyone doing three things at once since 7am. But all of a sudden she is hostile with me.

Then I walk into my patients room. Alysia was then hostile with me. I'm trying to figure out what's going on. I told I'm confused because Farah said Alysia was taking the patient. The delivery the wording was all hostile.

10/14/25, 5:53 PM





# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| **CHISULA CHAMBERS,** | Case No.: 2:25-cv-01862-RAJ |
| Plaintiff, | |
| vs. | **NOTICE OF FILING FIRST AMENDED COMPLAINT** |
| **UNIVERSITY OF WASHINGTON; AMY HAVERLAND; MORIAH JANKE; AND MARLOWE RAMIREZ,** | |
| Defendant | |

TO: Clerk of the Court and Counsel for Defendants

PLEASE TAKE NOTICE that pursuant to the Court's Order dated September 30, 2025, granting Plaintiff leave to amend within fifteen (15) days, Plaintiff hereby files the attached First Amended Complaint for Employment Discrimination, Retaliation, Civil Rights Violations, and Equitable Relief.

DATED this _15_ day of _October_, 2025.

Respectfully submitted,

Chisula Chambers
Pro Se Plaintiff

PO Box 112163
Tacoma, WA 98411

Email: ChisulaChambers@hotmail.com

NOTICE OF FILING FIRST AMENDED COMPLAINT - 1

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

**CHISULA CHAMBERS,**

      Plaintiff,

vs.

**UNIVERSITY OF WASHINGTON; AMY HAVERLAND; MORIAH JANKE; AND MARLOWE RAMIREZ,**

      Defendant

Case No.: 2:25-cv-01862-RAJ

**CERTIFICATE OF SERVICE**

I hereby certify that on the _15_ day of _October_, 2025, I caused a true and correct copy of the foregoing First Amended Complaint and Notice of Filing First Amended Complaint to be served upon the following via U.S. Mail and/or electronic mail:

Summit Law Group, PLLC
315 Fifth Avenue South, Suite 1000
Seattle, WA 98104

Counsel for Defendants University of Washington, Amy Haverland, Moriah Janke, and Marlowe Ramirez.

DATED this _15_ day of _October_, 2025.

_Chisula Chambers_
Chisula Chambers
Pro Se Plaintiff

CERTIFICATE OF SERVICE - 1

# TRANSACTION FORM



## U.S. BANKRUPTCY COURT
### or
### U.S. DISTRICT COURT
(circle one)



**COURTESY COPIES ARE TEMPORARILY NOT REQUIRED DURING THE COVID-19 EMERGENCY**

DATE & TIME: _10/14/2025_

NAME: _Chisula Chambers_

CASE NUMBER (IF KNOWN): _2:25-cv-01862-RAJ_

EMAIL: _Please email copy once recorded_ ~~Office~~

PHONE: _206-368-9545_

_officeofwazir @ gmail.com_

## REASON FOR TRANSACTION:

```
FILED _____ LODGED
_____ RECEIVED

OCT 1 5 2025

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                              DEPUTY
```

☐ NEW CASE FILING

☐ PAYMENT (Money Orders made payable to US District Court or US Bankruptcy Court)

**DO NOT LEAVE CASH OR PERSONAL CHECKS**

☐ FILING ADDITIONAL DOCUMENTS

☑ OTHER: _amended complaint_

_notice of filing_

_certificate of service_

_Summons_

_declaration_

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| **CHISULA CHAMBERS,** | Case No.: 2:25-cv-01862-RAJ |
| Plaintiff, | |
| vs. | **SUMMONS IN A CIVIL ACTION** |
| **UNIVERSITY OF WASHINGTON; AMY HAVERLAND; MORIAH JANKE; AND MARLOWE RAMIREZ,** | |
| Defendant | |

To: The above-named Defendants

A lawsuit has been filed against you. Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Chisula Chambers
Pro Se Plaintiff
PO Box 112163
Tacoma, WA 98411
Email: ChisulaChambers@hotmail.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.

CLERK OF COURT

By: _____
　　　　　　Deputy Clerk

Date: _____

SUMMONS IN A CIVIL ACTION - 1